## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **TED GRIFFIN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **5:04-CV-348 (DF)** |
| | : | |
| **GEORGE RUNYON, JR., in his** | : | |
| **individual capacity as a deputy** | : | |
| **sheriff of Houston County, Georgia,** | : | |
| | : | |
| **Defendant.** | : | |

_____

## <u>O R D E R</u>

Plaintiff Ted Griffin has sued Defendant George Runyon, Jr., in his individual capacity as a deputy sheriff employed by the Houston County, Georgia, Sheriff's Department, under 42 U.S.C.A. § 1983, alleging Fourth and Fourteenth Amendment excessive-force claims and a smattering of state-law claims including, assault, battery, and intentional infliction of emotional distress. Currently pending before the Court is a motion for summary judgment (doc. 15) filed by Runyon, in which he contends that he is immune from suit on the § 1983 claims under the doctrine of qualified immunity and that the state-law claims fail as a matter of law. For the following reasons, Runyon's motion is hereby **GRANTED.**

## I.  BACKGROUND

Construing the record in the light most favorable to Griffin, and drawing all reasonable inferences in his favor, the relevant facts, recounted in some detail, are these.  Griffin is a self-employed general contractor in Houston County, Georgia.  He has been a full-time homebuilder for the past 16 years.  The events giving rise to this lawsuit occurred on March 30, 2004.[1]  At 10:00 that morning, Griffin and several other local builders met at Walker's Grove, a subdivision then under development in Houston County, to discuss with Debra Mason, one of the subdivision's developers, the possibility of buying several vacant lots.  Griffin had previously built over 40 houses in Walker's Grove, and on March 30 he verbally agreed to buy lots 33 and 34 from Mason for $23,000 each.

Adjacent to Walker's Grove is a developed subdivision called Lake Point Plantation (Lake Point); some of the houses in Lake Point back up to vacant lots in Walker's Grove.  The rear of lot 34 abuts the rear of a Lake Point property known as 100 Richfield Court, owned by Sue Ann Richards (Richards) and her family.  The rear of lot 35[2] abuts the rear of a Lake Point property known as 102 Richfield Court, owned by Leanne Pate (Pate) and her family.  Located in Richards's backyard is a six-

---

[1] Relevant properties described in this Order are as they existed on March 30, 2004.

[2] Lot 35 was owned by another builder.

foot-tall, wooden privacy fence, which runs north/south along the boundary line between her property and lot 34, and east/west along the boundary line separating her lot from Pate's lot.

After the meeting with Mason, Griffin went home and made a copy of the subdivision plat, drafted a loan request to present to the bank, placed several telephone calls, and then returned to Walker's Grove around 1:00 in the afternoon to review the placement of the property pins marking the boundaries of several lots he intended to build on, including lots 33 and 34.[3]



---

[3] This diagram is not rendered to scale.  It is meant simply to give a rough approximation of the lay of the relevant properties.  The Court has combined the depictions shown on Defendant's Exhibits 1 (the subdivision plat for Walker's Grove) and 2 (a hand-drawn diagram made by Griffin during his deposition).  This layout is not in dispute.

When Griffin returned to Walker's Grove, he pulled his truck onto lot 33 and began looking toward the eastern boundaries of lots 33 and 34 for wooden stakes with neon ribbon tied to the tops. Surveyors place wooden stakes in the ground to indicate the location of iron pins, which serve as the actual corner boundary markers. Griffin got out of his truck and from his vantage point could see wooden stakes located along the eastern boundary of each lot throughout the subdivision, with the exception of lots 33 and 34.[4] Griffin did not initially see a pin or wooden stake on the northeastern corner of lot 33.[5] Griffin walked around for several minutes behind Richards's privacy fence (on the Walker's Grove side) looking for pins #1 and #2, with no luck. From that spot, however, he was able to see pin #3 on the southeastern corner of lot 35, located in a flowerbed just behind the deck in the rear of Pate's house.

Hoping to use pin #3 as a point of reference from which to look northward to locate pins #1 and #2, Griffin walked out from behind Richards's fence, where he had been positioned, headed in the direction of pin #3, and promptly had his first encounter with Pate. Pate was home alone and had seen Griffin wandering around behind her house and peering over Richards's fence. She was standing in her

---

[4] The places where the property pins for lot 34 should have been located are labeled on the diagram and hereafter as #1 and #2. Griffin came to suspect the property pins were placed on Richards's side of the privacy fence after he could not find them on the Walker's Grove side. Griffin never found pin #1 or pin #2 on March 30, 2004.

[5] That corner is unmarked on the diagram.

backyard up against the corner of the fence, and Griffin did not immediately see her as he moved out from behind the fence.  After Griffin had passed by her, Pate announced her presence and asked him what he was doing walking up and down behind Richards's fence.  Griffin did not respond.  Pate continued to ask Griffin what he was doing, and Griffin continued to ignore her questions.

Pate finally asked Griffin if he was a surveyor, and Griffin said that he was not. When she asked Griffin who had put an iron pin in her flowerbed, Griffin told her that she should take up any questions about the pin's location with the surveying firm responsible for surveying Walker's Grove.  Failing to get a response out of Griffin about what he was doing on the property line behind her home, Pate told him she was going to call "the law."  (Griffin Dep., doc. 23, 84:2).  Griffin told her that was fine with him and continued to look for the missing property pins.  Griffin said nothing further to Pate.  In the meantime, Pate called her neighbor, Sue Ann Richards, and told her that there was a man "climbing on her fence and looking over into her backyard." (Pate Dep., doc. 21, 17:14-15).  After more searching, Griffin ultimately spotted the pin at the northeastern corner of lot 33.

Still unable to find pins #1 and #2, Griffin remembered that a fellow builder had told him earlier in the day that a woman whose lot backed up to Walker's Grove was very upset that two property pins had been placed inside her privacy fence.

He suspected that the fence behind Richards's house might be the fence in question. Griffin concluded, based on what he had been told, that the property pins he was looking for were probably located inside her fence. To ensure that Richards's fence was the only privacy fence on the eastern side of Walker's Grove, however, Griffin got back into his truck, left lot 33, and made a quick trip through the subdivision. He found no other privacy fences.

When Griffin came back, he parked his truck near the boundary line separating lots 34 and 35 and continued to look for pins #1 and #2. By this time, Richards had come over to Pate's house. From his truck, at a distance of roughly 65 to 70 feet, Griffin could see both women sitting on the deck behind Pate's house.

Based on the dimensions listed on the subdivision plat, and the presence of pin #3 and another pin on the southwestern corner of lot 34 (next to Grove's Lane but unmarked on the above diagram), Griffin determined that, by marking off various distances with his tape measurer, he could predict with some degree of accuracy where pins #1 and #2 should be located. Griffin neared the women as he approached pin #3, but said nothing. He proceeded to hook his tape measurer around pin #3 and measure outward in a northerly direction 132.25 feet (where, according to the plat, pin #2 ought to be located). He made a mark in the soil at that spot. He then moved 71.45 feet up the property line (where the plat suggested pin #1 ought to be located)

and made a second mark in the soil.  He had no interaction with Pate or Richards during this time.

After marking up the soil, Griffin rolled up his tape and walked back to pin #3. He was standing beside pin #3 when Pate asked him again if he was a surveyor. Griffin did not respond.  He then walked out to Grove's Lane and hooked his tape measurer around the pin at the southwestern corner of lot 34.  He took another measurement and, based on his calculations, determined that in all likelihood pins #1 and #2 were inside Richards's fence.

Griffin approached Richards's fence at a spot just across from where he hoped to find pin #2.  There were several piles of lawn trash stacked up on the Walker's Grove side of Richards's fence, such that Griffin could, by walking on top of the piles, position himself high enough to peer over the fence into Richards's backyard.  Griffin mounted the trash piles and leaned over onto the fence.  As soon as Pate and Richards observed this from their location on Pate's deck, they immediately began demanding, insistently and loudly, that Griffin get off the fence.  Griffin ignored the two women and moved further down the fence, somewhere in between pins #1 and #2, in an effort "to get on away from them a little bit."  (Griffin Dep., doc. 23, 94:11).

Standing on a second pile of trash, Griffin, again with his hands on the fence, continued to look into Richards's backyard.  As Pate and Richards implored him to

-7-

get off the fence, Griffin decided to confront the women about the trash piles. Insinuating that it was Richards's trash, he asked the women if they would mind if he threw some of the lawn debris from the vacant lot back into Richards's yard.  At first the women denied having thrown any of the trash onto the vacant lot, but after Griffin held up a discarded houseplant for them to see, Richards admitted that her family members occasionally dumped lawn clippings on that side of the fence.  After this confrontation, the women "just shut up."  (Griffin Dep., doc. 23, 96:19).

Griffin then began to scratch around on the ground behind the fence, searching in vain for pins #1 and #2.  After doing this for several minutes, he heard someone saying, in a loud voice:  "Get back over here.  Get over here.  Get back over here." (Griffin Dep., doc. 23, 98:15-16). Griffin ignored the commands, thinking the women were yelling at a dog; as it turned out, however, the voice Griffin heard was that of Defendant Deputy Sheriff Runyon.[6]  While Griffin had been busy leaning over onto Richards's fence and rooting around behind it, Pate had called 911 to report an unidentified man crawling on her neighbor's fence.  She informed the 911 dispatcher that the man would not reveal who he was or what he was doing on their property.

The 911 dispatcher radioed Runyon and advised him that there was a

---

[6] Runyon noted in his deposition that he gradually increased the volume of his voice as he approached Griffin because Griffin did not initially respond when asked to identify himself.

"suspicious white male" at 100 and 102 Richfield Court "climbing on fences and walking through flower beds."  (Runyon Dep., doc. 24, 23:6-8).  While en route to Lake Point, Runyon received a second transmission from the 911 dispatcher alerting him that the unidentified male "had become vocal towards the women."  (Runyon Dep., doc. 24, 24:6).  Runyon arrived at Pate's house approximately 10 to 15 minutes after receiving the first call.

When the loud voice did not cease, Griffin finally looked up from what he was doing and saw Runyon standing approximately 70 feet away near the corner of the fence.  He could see that Runyon was in full uniform.  Runyon made it clear that his directions to "get over here" were meant for Griffin, and that he wanted Griffin to identify himself.  As Griffin approached Runyon, Griffin had his cell phone drawn and ready to call 911 to request the presence of other officers.  Griffin came to within two feet of Runyon.

Griffin immediately asked Runyon if he had a supervisor.  Runyon assured Griffin that he did have a supervisor, but that it was up to Runyon, not Griffin, to decide whether a supervisor's presence was necessary.  Runyon told Griffin that, according to Pate and Richards, he had threatened to throw trash into Richards's yard.  Griffin denied that allegation.  Then Griffin "tapped [Runyon] on the shoulder" using the "backside of [his] fingers" and pointed out the trash piles behind the fence on lot

-9-

34.  (Griffin Dep., doc. 23, 104:3-4, 8).

Runyon was not amused and sternly told Griffin to "Get your hands off me. Keep your hands off me."  (Griffin Dep., doc. 23, 104:9-10).  Runyon asked Griffin to explain what he was doing on the premises.  Griffin responded vaguely that he was "tending to [his] business," but did not elaborate.  (Griffin Dep., doc. 23, 104:23-25). Runyon then asked Griffin whether he owned the property behind Richards's fence. Griffin said he did.  Griffin then turned away from Runyon and proceeded down the fence toward pin #1, pointing out the trash along the way.  Runyon maintained his position near the corner of the fence.

Griffin picked up moderately sized, uprooted tree[7] and hurled it 40 feet directly toward Runyon, landing about five feet from him.  Griffin asked Runyon to have one of the women identify the tree.  Runyon did not do so, but did comment to Griffin that he was acting rather belligerently.  Griffin approached Runyon again and asked whether charges were being pressed against him at that time, and Runyon answered that none were.

Griffin and Runyon then walked over to pin #3, and Griffin began to explain to Runyon that Pate was upset with him because that pin was seven to eight feet inside

---

[7] The tree was approximately four feet tall with a 12-inch-tall root ball; the root ball measured roughly 14 to 16 inches in diameter.  (Griffin Dep., doc. 23, 187:1-3).

her flowerbed.  Runyon asked Griffin whether he owned the land where the two of them were standing, and Runyon said he did not.  The two then became involved in a heated dispute about whether Griffin had lied to Runyon earlier about owning the land on which he had been working that day.

Griffin told Runyon that he had a right to be where he was and to do what he was doing.  He then abruptly said to Runyon: "I'll tell you this right now, I have just answered the last questions I'm going to answer for them two women up there on that porch and I've just answered the last question I'm going to answer for you."  (Griffin Dep., doc. 23,  112:23–113:1).  Griffin and Runyon were standing "at the most probably a foot apart" when Griffin made that declaration.  (Griffin Dep., doc. 23, 113:11-12).  Pate and Richards observed this entire exchange from Pate's deck.

After Griffin made it clear that he no longer intended to cooperate with Runyon's investigation, Runyon reached out and grabbed Griffin's arm underneath his armpit and told him to "come with me."  (Griffin Dep., doc. 23, 115:13). Griffin—who "assumed that [Runyon] was snatching me across the property line" and believed that "[Runyon] was fixing to trump up a trespassing charge on me"—reacted by "snatch[ing] my arm back away from him" and "mov[ing] away from him." (Griffin Dep., doc. 23, 116:14-15).  Griffin continued to back away from Runyon, all the while checking his cell phone for reception.  Runyon made the

following repeated demands to Griffin: "Get back here.  Get back here to me.  Get over here, get back over here to me." (Griffin Dep., doc. 23, 117:14-16).  Griffin did not comply with Runyon's demands.  Runyon began to walk toward Griffin.  In response, Griffin fled further away from Runyon, in the direction of his truck.  When Runyon's repeated verbal instructions proved ineffective, Runyon pepper sprayed Griffin in the face and eyes.[8]

Griffin did not submit to the pepper spray application, but instead turned his back on Runyon and walked approximately 30 feet to his truck, which, during this entire episode, remained parked on the boundary line between lots 34 and 35.  Runyon trailed Griffin, approaching the truck and crouching down beside the right front tire.  As he did so, Runyon radioed in "officer down, officer down" because he had inadvertently discharged pepper spray into his eyes while spraying Griffin.  (Griffin Dep., doc. 23, 121:10; Runyon Dep., doc. 24, 60:13-14).

Griffin decided to get in his truck and drive down to an open water spigot on one of the nearby lots in the subdivision to flush the pepper spray out of his eyes.  As Griffin approached his truck, but before he could get inside, Runyon came around from the passenger side and sprayed Griffin a second time in the face.  The can of

---

[8] Runyon says he warned Griffin that the pepper spray was coming; Griffin denies that Runyon gave him a prior warning.

pepper spray came into contact with Griffin's face and caused a laceration above his eye.  Undeterred, Griffin fished his keys out of his pocket and tried once again to get in his truck.  Runyon attempted unsuccessfully to grab the back of Griffin's collar. Once Griffin had gotten inside the truck, Runyon tried to prevent Griffin from closing the driver's door, again without success.

Determined to prevent Griffin from leaving the scene, Runyon went back around to the passenger's side of the truck and reached his arm through the open window, pointing the can of pepper spray at Griffin.  Griffin said to Runyon, "You Goddamn better not spray that shit in this truck."  (Griffin Dep., doc. 23, 128:25–129:1).  Griffin then drove off in his truck, leaving Runyon behind.

Griffin found a water spigot on lot 34 where he proceeded to wash the pepper spray out of his eyes and off his body.  He had no further contact with Runyon. Approximately four to six law enforcement officials showed up on the scene in the aftermath of the incident.  One of them, Major Charles Holt of the Houston County Sheriff's Office, a long time friend of Griffin's, assured Griffin that he was not under arrest and told him he was free to leave the scene.

The entire encounter between Griffin and Runyon lasted less than 15 minutes.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).  A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986).  The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence. **Id.** at 249.  Finally, "the evidence presented cannot consist of conclusory allegations or legal conclusions."  **Avirgan v. Hull**, 932 F.2d 1572, 1577 (11th Cir. 1991).

## III.  DISCUSSION

### A.      Section 1983 Claims Against Runyon

Section 1983 imposes civil liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution."  42 U.S.C.A. § 1983 (West 2003).  It is undisputed that Runyon acted

under color of state law at all times relevant to this lawsuit.  Griffin alleges that two of his constitutional rights were violated when Runyon grabbed his arm and then used pepper spray on him.  One right upon which Griffin relies is secured by the Fourth Amendment, and the other is secured by the Fourteenth Amendment.  *See* Compl. ¶41; Pl.'s Br. Opp'n Def.'s Mot. Summ. J., doc. 19, at 4-5.

First, Griffin argues that Runyon's actions constituted a "seizure" under the Fourth Amendment and that that seizure was constitutionally impermissible because there was no legal basis for it and because it was effected with an unreasonable application of force (grabbing his arm and pepper spraying him in the face) under the circumstances.  Second, Griffin argues that Runyon's actions deprived him of his Fourteenth Amendment substantive due process liberty interest in remaining free from abusive governmental conduct.  Regarding the latter claim, Griffin maintains that Runyon's actions were not justified by any legitimate law enforcement objective and were, therefore, arbitrary and shocking to the conscience.

Where a plaintiff's excessive-force claim arises in the context of an arrest, investigatory stop, or other "seizure" of his person, that claim "is most properly characterized as one invoking the protections of the Fourth Amendment." ***Graham v. Connor***, 490 U.S. 386, 394 (1989).  Otherwise, a plaintiff's pre-conviction claim of excessive force or abusive governmental treatment—a claim that is not "covered

by" the Fourth Amendment—will lie under the Due Process Clause of the Fourteenth Amendment. *Id.* at 395 n.10; *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). Both parties concede that if the Fourth Amendment controls Griffin's claim, substantive due process analysis under the Fourteenth Amendment is inappropriate.

**B.     Is Griffin's Claim Covered by the Fourth Amendment**

"The Fourth Amendment covers only 'searches and seizures.'" *City of Sacramento*, 523 U.S. at 843. An arrest is "the quintessential 'seizure of the person' under [the] Fourth Amendment." *California v. Hodari*, 499 U.S. 621, 624 (1991). Runyon did not place Griffin under arrest on the day of the incident, and Griffin maintains that at no time during their encounter did Runyon ever tell him he was under arrest or otherwise threaten to arrest him. But a person may nevertheless be "seized" within the meaning of the Fourth Amendment without being formally arrested. A Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *City of Sacramento*, 523 U.S. at 844 (quoting *Brower v. City of Inyo*, 489 U.S. 593, 596-97 (1989)).

Runyon grabbed Griffin's arm and pepper sprayed his face in a calculated effort to prevent Griffin's flight and bring him into compliance with Runyon's verbal commands to halt. Both of these actions were means intentionally applied to

terminate Griffin's freedom of movement, and Griffin was therefore seized for Fourth Amendment purposes.  It is irrelevant that Runyon's efforts were unsuccessful, as evidenced by Griffin's jerking his arm away from Runyon's grasp and driving off in his pickup truck after being pepper sprayed twice.[9]  *See Hodari*, 499 U.S. at 626 ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, *even when it is ultimately unsuccessful*.") (emphasis added).  Because Griffin was seized, his assertion that the applications of force used to effect that seizure were unlawful must be analyzed under the "reasonableness" standard of the Fourth Amendment, and not under the "conscience shocking" standard of the Fourteenth Amendment.  Griffin's Fourteenth Amendment claim is accordingly dismissed.

Runyon argues that he is entitled to qualified immunity with respect to Griffin's Fourth Amendment claim.

---

[9] This is not true where an officer attempts to seize an individual (to terminate his freedom of movement) only through a show of authority (without an application of physical force), but the individual does not yield.  In that situation, a "seizure" has not occurred.  *See Hodari*, 499 U.S. at 626.

### 1.    Qualified Immunity

More than simply an affirmative defense, qualified immunity is a freedom from suit that offers "complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal quotations ommitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Id.* at 1194.  Its protection extends to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As a threshold matter, before becoming eligible for qualified immunity, a government official must show that he was engaged in a "discretionary function" when he performed the act of which the plaintiff complains.  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Here, when Runyon responded to Pate's 911 call and subsequently investigated the reasons for Griffin's presence on Richards's and Pate's property, he was unquestionably performing discretionary functions; therefore, Runyon is entitled to assert the protection of qualified immunity.

Once qualified immunity is properly invoked, "the burden shifts to the plaintiff

to show that the defendant is not entitled to" its protection. **Cottone v. Jenne**, 326 F.3d 1352, 1358 (11th Cir. 2003). To overcome an assertion of qualified immunity, the plaintiff must show that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." **Holloman**, 370 F.3d at 1264; *see* **Conn v. Gabbert**, 526 U.S. 286, 290 (1999). In making this showing, the plaintiff must bear in mind that "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." **Crawford-El v. Britton**, 523 U.S. 574, 588 (1998).

The Court must evaluate the evidence in the light most favorable to the party asserting the injury. *See* **Saucier v. Katz**, 533 U.S. 194, 201 (2001). The second requirement—that the official must have violated a "clearly established" right of the plaintiff—comes into play only "[i]f a constitutional right would have been violated under the *plaintiff's* version of the facts." **Ferraro**, 284 F.3d at 1194; *see, e.g.,* **Harris v. Coweta County, Ga.**, 406 F.3d 1307, 1313 (11th Cir. 2005) ("If, assuming the plaintiff's allegations were true, no [constitutional] right would have been violated, the analysis is complete."). Accordingly, the Court will first address whether Runyon's actions violated Griffin's Fourth Amendment rights.

### a.    Constitutional Violation

As discussed above, the guarantees of the Fourth Amendment encompass the right to be free from unreasonable force in the context of a seizure.  *See Graham*, 490 U.S. at 394; *see also Ferraro*, 284 F.3d at 1197.  In evaluating whether an officer's use of force comports with the Fourth Amendment, the Court must determine "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Ferraro*, 284 F.3d at 1197.  This determination requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

As the Eleventh Circuit has emphasized, "[t]he 'reasonableness' inquiry [ ] is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington* (11th Cir. 2004).  This objective inquiry "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

It is well settled that a law enforcement officer's "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical

coercion or threat thereof to effect it." *Id.*  The lawfulness of a particular application of force is context specific and will necessarily vary from situation to situation.  The Supreme Court in *Graham* explained the relevant considerations attending Fourth Amendment excessive-force claims, noting that the "objective reasonableness" standard:

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

490 U.S. at 396-97 (internal citations omitted).

Mindful of these considerations, the Court, accepting Griffin's characterization of the facts for purposes of this analysis, turns now to the two questions relevant to Griffin's Fourth Amendment claim—(1) whether Griffin's seizure was legally justified and, if so, (2) whether the means used to effect it were objectively reasonable under the totality of the circumstances.

       *i.*      *Was there a sufficient quantum of suspicion to justify the seizure?*

"In order to justify [ ] a Fourth Amendment 'seizure,' the government must show a reasonable, articulable suspicion that the person has committed or is about to commit a crime." ***United States v. Perez***, 443 F.3d 772, 777 (11th Cir. 2006). Reasonable suspicion is measured against "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information." ***Ferraro***, 284 F.3d at 1195. If those facts and circumstances "would cause a prudent person to believe that the suspect has committed . . . an offense," then reasonable suspicion sufficient to support a Fourth Amendment detention or seizure exists. ***Id.***

Based on the information he received from the 911 dispatcher and the conversation he had with Richards and Pate when he arrived on the scene, Runyon had at least reasonable suspicion to suspect that Griffin had trespassed on Richards's property (her fence) after repeatedly being told to stop by both Richards and Pate. (Runyon Dep., doc. 23, 34:25–35:6) ("[T]hey both said that there's a man behind their homes that had been climbing on the fence at 100 and walking in the flower beds at 102, and they said that they were scared of the man, and when they asked him to get off the fence, that he continually got on it and that he was cursing and yelling at them."). Runyon also had reasonable suspicion to believe that Griffin had trespassed

on Pate's property, once Griffin acknowledged that he did not own the property where pin #3 was located. Moreover, Runyon knew that Pate had not given Griffin permission to enter her backyard. Runyon was therefore in receipt of trustworthy information that Griffin had "[r]emain[ed] upon the land or premises of another person . . . after receiving notice from the owner . . . to depart." O.C.G.A. § 16-7-21(b)(3) (Lexis 2003). Because Runyon had reasonable suspicion to believe that Griffin had engaged in criminal trespass, he was authorized to investigate the matter more fully and, on the basis of that reasonable suspicion, to detain Griffin for questioning to figure out whether Griffin may have violated the law.

Griffin argues that Runyon had insufficient legal cause to support an arrest for criminal trespass because (1) at the time of the incident Griffin subjectively believed that Richards's fence encroached on his lot, and because (2) a survey taken after March 30 revealed that Richards's fence did in fact encroach on his lot.

Griffin's subjective belief regarding the location of Richards's fence may be relevant as a defense to a prosecution for criminal trespass because the trespass statute requires a "knowing" violation. O.C.G.A. § 16-7-21(b). But that belief has no bearing on the Fourth Amendment reasonable-suspicion inquiry, an inquiry concerned exclusively with "the facts and circumstances within the officer's knowledge." *Ferraro*, 284 F.3d at 1195. Griffin never told Runyon that he believed

-23-

Richards's fence was partially located on his property.  Similarly, with respect to Griffin's second argument, the subsequent survey showing that Richards's fence actually encroached Griffin's land is not relevant to the reasonable-suspicion inquiry because it was not known to Runyon (in fact the survey was not yet in existence) on March 30.

The facts and circumstances known to Runyon at the time of his encounter with Griffin demonstrate that Runyon had reasonable suspicion to support an investigatory detention and subsequent seizure.

> ii.    *Was Runyon justified in grasping Griffin's arm and in using pepper spray against him in an attempt to prevent Griffin's flight?*

Griffin argues that Runyon's grasping his arm and spraying him in the face with pepper spray were unreasonable applications of force under the circumstances.  In determining whether a particular application of force is reasonable in a given situation, the Court considers factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and *whether he is actively resisting arrest or attempting to evade arrest by flight*."  **Graham**, 490 U.S. at 396 (emphasis added).  The Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  **Id.**

Runyon touched Griffin only after he came to suspect that Griffin was being untruthful regarding his ownership of the property on which he was located and only after Griffin expressly refused to cooperate with Runyon's questions.  Until Griffin acknowledged not owning the property near pin #3, he had given Runyon the impression that he had a right to be on Pate's property.  When Runyon learned otherwise, he grabbed Griffin's arm and told him to "come with me."  Runyon wanted to get to the bottom of the matter, and up to that point had received no cooperation from Griffin.  Runyon did not strike or shove Griffin or in any other way act physically abusive toward him.

The Court also finds significant the fact that this *de minimis* physical contact came only after Griffin had "tapped" Runyon on his shoulder using the back of his hand and thrown an uprooted tree over 40 feet at him—belligerent behavior, in Runyon's estimation.  (Griffin Dep., doc. 23, 109:2).  Where Runyon had reasonable suspicion to believe Griffin had committed a criminal trespass, and where Griffin expressly and unequivocally refused to answer Runyon's questions about what he was doing on the property, grabbing Griffin by the arm was not an excessive use of force. A reasonable officer in Runyon's position could easily have concluded that this slight contact was necessary when viewed in light of Griffin's behavior on the scene. ***Ferraro***, 284 F.3d at 1197.

-25-

Immediately upon being touched, Griffin forcefully "snatched" his arm away from Runyon and began backing away from him. (Griffin Dep., doc. 23, 116:14-15). Runyon told him to stop. Griffin did not respond, but rather kept backing away from Runyon, in the direction of his truck—a quick means of escape, which was parked about 70 feet away. Runyon again shouted at Griffin to halt, repeatedly telling him to come back to where Runyon was standing. Griffin continued to ignore Runyon. As Runyon began to approach Griffin, Griffin backed closer toward his truck, escalating the situation by failing to heed Runyon's lawful commands. When it became apparent that Griffin was not going to submit to Runyon's verbal instructions, Runyon resorted to the use of pepper spray as a means of stopping Griffin's backward flight. The circumstances indicate that physical force was Runyon's only alternative if he was to have any realistic chance of preventing Griffin from getting in his truck and driving away from the scene.

Runyon reasonably suspected Griffin of having committed criminal trespass, which, while not a particularly serious crime, is a crime nevertheless. When a law enforcement officer has sufficient reason to believe that an individual has committed a crime and, while under questioning, that individual attempts to flee the officer's presence, it is reasonable for the officer to expect that his verbal commands to halt will be obeyed. And, where the individual refuses to submit to the officer's verbal

commands, it is likewise reasonable to expect that the officer will resort to some application of force necessary to bring about the individual's submission. *See Graham*, 490 U.S. at 396 ("the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Here, Runyon resorted to pepper spray—a minimally intrusive tool—to stop Griffin's flight. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003) (recognizing pepper spray as "an especially noninvasive weapon" which "ordinarily causes only temporary discomfort"). The Court finds that Runyon's choice was not an unreasonable one.

The facts and circumstances facing Runyon during his encounter with Griffin demonstrate the following: Runyon had reasonable suspicion to believe Griffin had committed a criminal trespass; Runyon's questions to Griffin were met with evasive answers and uncooperative behavior; Griffin touched Runyon's shoulder; Griffin threw an uprooted tree over 40 feet directly at Runyon; Griffin forcibly snatched his arm away from Runyon and backed away toward his truck; Griffin continued to flee Runyon's presence despite being given repeated directions not to do so, and; Griffin continued to move in the direction of his truck even as Runyon approached him and told him to stop.

Two blasts of pepper spray under these circumstances does not represent an

-27-

unreasonable application of force under the Fourth Amendment.  The nature of the intrusion on Griffin's Fourth Amendment rights was relatively minor (application of a noninvasive chemical, which causes only temporary discomfort) when weighed against the countervailing governmental interest at stake (the unquestionably legitimate law enforcement objective of preventing a suspected lawbreaker from ignoring an official's repeated commands and from fleeing the scene).  *See **Graham***, 490 U.S. at 396.  Because no constitutional violation occurred, Runyon is immune from suit as a matter of law, making the "clearly established" analysis unnecessary.  The Court accordingly grants summary judgment in favor of Runyon on Griffin's Fourth Amendment claim.

### B.    State-Law Claims Against Runyon

In addition to the federal constitutional claims brought under § 1983, Griffin has alleged in his complaint a number of claims arising under Georgia law.  The Court's jurisdiction over Griffin's state-law claims is supplemental, not original.  *See* 28 § U.S.C.A. § 1367(a).  Once the Court dismisses all claims over which it has original jurisdiction (here the Fourth and Fourteenth Amendment claims), it may decline to exercise its supplemental jurisdiction over the state-law claims.  *See* 28 U.S.C.A. § 1367(c)(3).  The Court declines to exercise supplemental jurisdiction over the state-law claims presented in Griffin's complaint.  Those claims are dismissed

without prejudice.

## IV.  CONCLUSION

For the foregoing reasons, Runyon's motion for summary judgment (doc. 15)

is hereby **GRANTED.**


SO ORDERED, this 16th day of May, 2006.


**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew